UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

D'ANDRE ALEXANDER #731077,

        Plaintiff,

v.                                 Case No. 2:16-cv-96
                                 HON.  GORDON J. QUIST

MANDI JOY SALMI, et al.,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by state prisoner D'Andre Alexander pursuant to 42 U.S.C. § 1983.  In his complaint, Plaintiff asserted various constitutional and state law claims against Michigan Department of Corrections ("MDOC") employees that arose from his incarceration at the Marquette Branch Prison ("MBP").  At this stage in the proceedings, Plaintiff's remaining constitutional claims include, (1) a deliberate indifference Eighth Amendment claim against Mental Health Case Manager Mandi Joy Salmi; Mental Health Staff Members Tom Osier, Robin Bailey-Webb, Amy Robare, and Mark Hares; Mental Health Unit Chief Paul Eyke; and Corrections Officer Joshua Lombard; and (2) a retaliation claim against Defendant Salmi. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). (ECF No. 128.)  Plaintiff has responded.  (ECF No. 149.)  Defendants have replied.  (ECF No. 154.)  This matter is ready for decision.

Plaintiff has a history of mental illness.  According to his medical records, he has been diagnosed with a Mood Disorder, Poly Substance Dependence, and Antisocial Personality Disorder.  In addition to his mental illness, Plaintiff has a history of noncompliance while

incarcerated within the MDOC.  In April 2014, Plaintiff was transferred to MBP due to an increase in his security level.  Defendant Salmi, who is a Qualified Mental Health Professional (QMHP), was assigned as Plaintiff's case manager at MBP.  When he first arrived at MBP, Plaintiff was initially housed in segregation.  The initial stay in segregation lasted for approximately one month, and Plaintiff was subsequently transferred to general population.

On October 28, 2014, Plaintiff filed a grievance against Defendant Salmi, alleging that she was insufficient as a case manager and refused to accommodate his medical health needs and follow MDOC policy.  (ECF No. 1-1, PageID.15.)  At Step I, Defendant Bailey-Webb was the respondent, and Defendant Eyke was the reviewer.  At Step II, Defendant Osier was the respondent.  At both steps, Defendants denied Plaintiff's grievance because they determined that Defendant Salmi was properly following MDOC policy.  This determination was made after reviewing both MDOC policy and Plaintiff's medical records.

On February 2, 2015, Plaintiff was placed in segregation because he was involved in a fight.  Defendant Salmi subsequently filled out at "Misconduct Sanction Assessment" in which she wrote, "Prolonged segregation placement is likely to decompensate his mental health status." (ECF No. 150-1, PageID.1062.)  On February 6, 2015, Plaintiff refused a "call out" and was seen at his cell.  (ECF No. 150-3, PageID.1152.)  On February 10, 2015, Defendant Salmi appears to have recommended that Plaintiff be reclassified to general population.  However, after further review, it was determined that Plaintiff should remain in segregation because "the misconducts . . . demonstrate an inability to be managed with general population privileges."  (ECF No. 150-1, PageID.1065.)  The next day, Defendant Salmi sent a "Mental Health Management Plan" to the Housing Unit Staff.  The plan noted that Plaintiff was mentally ill and required special management while in segregation, but also detailed that Plaintiff was a "LOW RISK of suicide or self-injury."

(ECF No. 150-1, PageID.1088.)  Moreover, a QMHP was to reevaluate Plaintiff once a week while he was housed in segregation.  Plaintiff remained in segregation for eighty days.  During that time, Plaintiff made several health care requests complaining of depression, stress, chest pains, decreased appetite, and shortness of breath.  (ECF No. 150-1, PageID.1089-1099.)

On April 23, 2015, Plaintiff was released from segregation; however, he was placed back in segregation for threatening behavior only two days later.[1]  Once he returned to segregation, Plaintiff continued to submit healthcare requests complaining about segregation.  On April 29, 2015, Plaintiff requested to be moved to "F-Block."  Defendant Salmi replied, "You don't qualify, you don't have a mental illness."  On May 6, 2015, Plaintiff reported to Defendant Slami that he was feeling stressed and depressed.  (ECF No. 150-2, PageID.1115.)  Plaintiff also told Defendant Salmi that he found his mother after she committed suicide when he was a child.  However, Defendant Salmi determined that Plaintiff did not "express suicidal ideation."  Furthermore, the parties agreed to have Plaintiff work on a "grief handout."

On May 12, 2015, Plaintiff filed another grievance, alleging that Defendant Salmi was disregarding his mental needs and failing to "appeal" Plaintiff out of segregation.  (ECF No. 1-20, PageID.51.)  At Step I, Defendant Robare, who was the respondent, and Defendant Eyke, who was the reviewer, denied Plaintiff's grievance

On May 14, 2015, Defendant Salmi responded to a kite in which Plaintiff complained again about being stressed, depressed, and unnecessarily held in segregation.  (ECF No. 150-2, PageID.1118.)  Defendant Salmi encouraged Plaintiff to work on his grief handout and told Plaintiff that he would see "the OPT provider for a med review."  Later that day, Nurse

---

[1] Plaintiff states that he was sent back to segregation "due to a fabricated misconduct unrelated to this action." (ECF No. 149, PageID.1022.) According to his medical records, Plaintiff said, "he had gone down to the cell of another inmate who had stolen his TV and was punching his fist into his open palm."  (ECF No. 150-2, PageID.1132.)

Practitioner Andrew G. Boudreau[2] evaluated Plaintiff in segregation and reviewed his prescribed medication.  During this evaluation, Plaintiff told Defendant Boudreau that he could no longer handle segregation.  Plaintiff also mentioned the death of his mother.  The medical records indicate that Plaintiff appeared paranoid, irritable, and depressed.  Notably, Plaintiff denied having any thoughts of self-harm.  Despite Plaintiff's request, Defendant Boudreau did not refer Plaintiff to see a psychiatrist.  Instead, Defendant Boudreau prescribed Plaintiff a low dose of Risperdal. Risperdal is an antipsychotic drug used to treat a variety of mental health issues including paranoia, bipolar disorder, and schizophrenia.

On May 15, 2015, Defendant Salmi again met with Plaintiff.  Plaintiff told Defendant Salmi, "I want to get to feeling to the point where I can say that I have something to live for."  (ECF No. 150-2, PageID.1123.)  Based on their discussion, Defendant Salmi identified two "problems" that needed to be addressed—depression and chemical dependence.  Defendant Salmi then created a treatment plan, which consisted of a total of six objectives, to alleviate depressive symptoms and sustain abstinence from all mood altering substances.  On May 19, 2015, Plaintiff alleges that he requested mental health programing, and Defendant Salmi replied, "No you weak minded fuck."

On May 26, 2015, Plaintiff told Defendant Lombard about his mental health problems and requested him to "call mental health because he needed crisis intervention."  (ECF No. 149, PageID.1038.)  Plaintiff also alleges that he showed Defendant Lombard documentation of a previous suicide attempt to which Defendant Lombard replied, "that was 6 years ago."  Shortly thereafter, Plaintiff attempted to hang himself.  Prison staff quickly cut Plaintiff down and rushed him to healthcare.  Plaintiff was subsequently moved to a different unit and placed on observation.

---

[2] Andrew Boudreau was formerly a defendant in this case but has been dismissed.  (ECF Nos. 82, 104, & 157.)

The next day, Plaintiff was seen for a Suicide Risk Evaluation.[3]  (ECF No. 150-2, PageID.1132.)  Defendant Eyke determined that Plaintiff presented a "moderate" suicide risk.  When Defendant Eyke told Plaintiff that mental health could not get him out of segregation, Plaintiff "appeared to lose interest in the conversation."  On June 1, 2015, Defendant Robare conducted a second suicide evaluation.   (ECF No. 150-3, PageID.1175.)   Defendant Robare recommended continuing moderate safety management precautions.  On June 2, 2015, Plaintiff complained about Defendant Salmi to Defendant Hares.  (ECF No 149, PageID.1037.)  Plaintiff was returned to segregation on June 4, 2015.

On June 7, 2015, Plaintiff filed a grievance, alleging that Defendant Salmi refused to "acknowledge, address, and log medical kites."  (ECF No. 1-19, PageID.47.)  Plaintiff's grievance was subsequently denied at Step I by Defendant Robare, who was the respondent, and Defendant Eyke, who was the reviewer.   On June 22, 2015, Plaintiff filed another grievance, alleging that Defendant Robare was not allowing Plaintiff to appeal his segregation placement because he did not have a proper medical diagnosis.  (ECF No. 18, PageID.43.)  Plaintiff also alleged that he showed Defendants Hares and Robare medical documentation of his mental illness diagnosis.  Plaintiff's grievance was subsequently denied at Step I by Defendant Hares, who was the respondent, and Defendant Eyke, who was the reviewer.

On June 26, 2015, Defendant Boudreau again evaluated Plaintiff.  (ECF No. 150-3, PageID.1154.)  During this evaluation, Plaintiff called Defendant Boudreau "android" and accused him of trying to erase his thoughts with medication.  Plaintiff also thought Defendant Boudreau's emblem on his shirt was a gang symbol.  Because of Plaintiff's anger and delusions,

---

[3] Plaintiff alleges that Defendatn Eyke was the examiner.  The medical record suggests that Defendant Eyke made the referral.  However, Defendants did not address this fact; therefore, the undersigned will assume Defendant Eyke was the examiner during this evaluation.

Defendant Boudreau was unable to discuss Plaintiff's treatment plan during the evaluation.  After the evaluation, Defendant Boudreau referred Plaintiff to a psychiatrist.

On July 7, 2015, Plaintiff was evaluated by a psychiatrist.  (ECF No. 150-3, PageID.1147.)  The psychiatrist determined that Plaintiff was suffering from a brief active psychosis "for approximately the past month."  The psychiatrist noted that this diagnosis is consistent with Plaintiff's previous diagnosis of Antisocial Personality Disorder.  The psychiatrist also found that Plaintiff may have PTSD from his mother's death.  Shortly thereafter, Plaintiff was moved from segregation.

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  *Id.* at 324-25.  The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  The evidence must be viewed in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.  *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (citing *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

In addition, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones*, Inc., 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); cf. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

The undersigned will first address Plaintiff's deliberate indifference Eighth Amendment claim against Defendants. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). A prison official violates the Eighth Amendment when the official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention."  *Blackmore v. Kalamazoo County,* 390 F.3d 890, 897 (6th Cir. 2004) (citing *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir. 1990)).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care."  *Brown v. Bargery,* 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer,* 511 U.S. at 834).  Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*  Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment.  *Estelle,* 429 U.S. at 105.  As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).  Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.  *Sanderfer v. Nichols,* 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).  This is so even if the

misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau,* No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas,* 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cnty.,* 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland County,* 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson,* 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin,* 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton,* 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall,* 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger,* 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger,* 553 F. App'x 602, 605 (6th Cir. 2013) (quoting *Alspaugh v. McConnell,* 643 F.3d 162, 169 (6th Cir. 2011)).

First, the undersigned must determine whether Plaintiff can satisfy the objective prong of the deliberate indifference test. The Sixth Circuit has "held that 'psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies.'" *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir. 2001) (quoting *Horn v. Madison Cty. Fiscal Ct.,* 22 F.3d 653, 660 (6th Cir. 1994)). Here, Plaintiff alleges that Defendants were deliberately indifferent to his serious mental health needs, including the risk of suicide. Therefore, Plaintiff satisfies the objective prong of the deliberate indifference test.

Next, the undersigned must determine whether Plaintiff can satisfy the subjective prong of the deliberate indifference test as to each Defendant. In doing so, the undersigned considers whether each Defendant had "a sufficiently culpable state of mind in denying medical care" for Plaintiff's serious mental health need. *See Brown v. Bargery,* 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer,* 511 U.S. at 834). In the prisoner "suicide context, plaintiff must show that there was a 'strong,' 'obvious,' or 'clearly foreseeable' likelihood 'that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference.'" *Broughton v. Premier Health Care Servs.*, 656 F. App'x 54, 57 (6th Cir. 2016) (quoting *Gray v. City of Detroit,* 399 F.3d 612, 616 (6th Cir. 2005)).

Here, Plaintiff cannot satisfy the subjective component of the deliberate indifference test. The record establishes that Plaintiff was not completely denied medical treatment for his mental illness. He was placed in segregation on February 2, 2015, because he was in a fight. He was eventually released from segregation but returned two days later because of more threatening behavior. Segregation was necessary because Plaintiff's history of misconduct "demonstrate[d] an inability to be managed with general population privileges." During his time in segregation, Plaintiff was routinely seen by his case manager—Defendant Salmi.[4] Defendant Salmi created a Mental Health Management Plan and encouraged Plaintiff to complete a grief handout and work on his coping skills. It is true that Plaintiff's mental health condition deteriorated over time while he was housed in segregation. But, as Plaintiff's condition worsened, Plaintiff received more mental health treatment. For example, on May 14, 2015, Plaintiff was prescribed a low dose of the anti-psychotic drug Risperdal. He was also prescribed Benadryl to help him sleep and Wellbutrin to treat his depression. Prior to Plaintiff's attempted suicide, there

---

[4] The parties dispute the length of these visits. Defendant Salmi states that Plaintiff routinely refused to cooperate during the visits. Plaintiff states that the visits typically did not last longer than sixty seconds.

was no evidence to suggest that Plaintiff presented as a "strong," "obvious," or "clearly foreseeable" suicide risk.  Although Plaintiff made several general complaints about stress and depression,[5] Plaintiff repeatedly denied having any thoughts of self-harm.  When he attempted to commit suicide, prison officials quickly responded and Plaintiff only suffered minor physical injuries—bruising around his neck that was no longer visible the following day.  (ECF No. 129-1, PageID.896.)  Plaintiff was then placed in an observation cell for nine days, and after several suicide evaluations, it was determined that Plaintiff could return to segregation.  Plaintiff continued to be routinely evaluated until his condition declined.  On June 26, 2015, the nurse practitioner noticed that Plaintiff's symptoms had escalated and he referred Plaintiff to a psychiatrist.  The psychiatrist determined that Plaintiff was suffering from a brief active psychosis and Plaintiff was then appealed out of segregation.

Plaintiff's main complaint is that he should have been "appealed" out of segregation much earlier.  He identifies several actions that each Defendant could have taken to prevent his worsening mental condition and attempted suicide.  In hindsight, Defendants may have been negligent in treating Plaintiff.  However, "it is well-settled that ordinary negligence or medical malpractice cannot satisfy the subjective component of deliberate indifference: 'When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.'" *Broughton v. Premier Health Care Servs., Inc.*, 656 F. App'x 54, 57 (6th Cir. 2016) (quoting *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir. 2001)).

---

[5] Defendants may have been justified in viewing Plaintiff's complaints with skepticism because he recently spent time in segregation, had a history of noncompliance, and exhibited manipulative behavior.

The undersigned also notes that Defendants Osier and Bailey-Webb did not have sufficient personal involvement in the alleged unconstitutional conduct.  Unlike Defendants Eyke and Robare, Defendants Osier and Bailey-Webb never actually examined Plaintiff.  Plaintiff's claim against Defendants Osier and Bailey-Webb is premised solely on their failure to act when responding to Plaintiff's grievances.  "[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'"  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998)).  Thus, a prison official cannot be held liable under § 1983 either for denying administrative grievances or for failing to remedy alleged unconstitutional behavior, because such actions are not equivalent to "approv[ing] or knowingly acquiesc[ing] in the unconstitutional conduct."  *Id.*  Despite Plaintiff's conclusory assertions, there are no allegations that Defendants Osier and Bailey-Webb directly participated, encouraged, authorized, or acquiesced in any unconstitutional conduct.

Finally, the undersigned notes the inconsistencies in the allegations against Defendant Lombard.  Plaintiff's alleges that Defendant Lombard was deliberately indifferent when he refused to contact mental health after Plaintiff asked him to "call mental health because he needed crisis intervention" on May 26, 2015.  (ECF No. 149, PageID.1038.)  Plaintiff also claims that he showed Defendant Lombard documentation of a previous suicide attempt to which Defendant Lombard replied, "that was 6 years ago."  Defendant Lombard denies that this conversation occurred and states that if Plaintiff verbalized any mental health issues, he would have contacted his supervisor and mental health staff.  As noted above, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Here, Plaintiff's story is blatantly contradicted by the record.  In his deposition, Plaintiff claimed that he attempted to commit suicide at Carson City Correctional Facility in 2011.  (ECF No. 129-1, PageID.888.)  If the attempt occurred in 2011, it does not follow logically that, in 2015, Defendant Lombard told Plaintiff "that was 6 years ago."  In addition, when pressed on what documentation Plaintiff showed Defendant Lombard, Plaintiff stated, "Just documents I had in my possession that shows extensive mental health treatment and diagnosis at different facilities and things of that nature." (ECF No. 129-1, PageID.895.) However, Plaintiff has not presented any documentation of the 2011 suicide attempt to this Court.  Based on these reasons, the undersigned finds that no reasonable jury could find that Defendant Lombard acted deliberately indifferent to Plaintiff's medical needs.

Next, the undersigned addresses Plaintiff's retaliation claim against Defendant Salmi.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff alleges that Defendant Salmi retaliated against him when she refused to appeal Plaintiff out of segregation because Plaintiff filed grievances.  The filing of grievances is

protected conduct, *see Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); thus, Plaintiff was engaged in protected conduct.   Next, Defendant Salmi's refusal to "appeal" Plaintiff out of segregation may amount to an adverse act capable of deterring a person of ordinary firmness from engaging in filing grievances.   However, Plaintiff has failed to show that Defendant Salmi's actions were motivated by the filing of any grievances.   Plaintiff filed the first grievance against Defendant Salmi on October 28, 2014.   He was not placed into segregation until February 2, 2015.   Thus, temporal proximity does not suggest a causal connection between the grievance and the adverse action.   *See Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) (Temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'").   Plaintiff attempts to establish the casual connection by pointing out that Defendant Salmi said, "I'm making sure you go back to segregation" on May 29, 2015, and called him a "weak minded fuck" on May 29, 2015.   These ambiguous statements do not show any connection between the grievances and the adverse act.   Simply, Plaintiff offers no evidence to show that Defendant Salmi's actions were motivated by Plaintiff's filing of grievances.

Defendants alternatively move for qualified immunity.   Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.   *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful.   *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).   "Qualified immunity balances

two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 232.  If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted.  The court may consider either approach without regard to sequence. *Id.*  Because Plaintiff cannot establish that his constitutional rights were violated, Defendants are entitled to qualified immunity.

Finally, the undersigned must address Plaintiff's pending state-law claims.  In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.*  Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise*, 668 F.3d 843, 850 (6th Cir. 2012).  Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction.  Therefore, in the opinion of the undersigned, Plaintiff's state-law claims should be dismissed.

Accordingly, it is recommended that Defendants' motion for summary judgment (ECF No. 128) be granted and that this case be dismissed in its entirety.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $505 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505 appellate filing fee in one lump sum.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:  January 24, 2018

        /s/ Timothy P. Greeley           
        TIMOTHY P. GREELEY
        UNITED STATES MAGISTRATE JUDGE